UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JEROME WHITE HORSE, JR.,<br><br>Defendant. | 3:20-CR-30058(01)-RAL<br><br>REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS STATEMENTS |

Tribal officers questioned Jerome White Horse, Jr., at the scene of a vehicle accident and assailment and again in a contiguous house he was an occupant of. In a pretrial motion, White Horse seeks to suppress the statements he made, both in and outside the residence. Because he was never questioned while in custody and the officers lawfully entered the home with consent, the Court recommends that White Horse's suppression motion be denied.

BACKGROUND

Some time after 10:00 p.m. on February 12, 2020, Ramon Marrufo, a lieutenant with the Cheyenne River Sioux Tribe (CRST), responded to and arrived at a vehicle accident and alleged assault in Cherry Creek, South Dakota. Marrufo made contact with Lawrence (Larry) Lafferty who was bleeding profusely from the head. Marrufo rendered first aid to Lafferty and then began photographing the site. While taking

pictures, Marrufo asked White Horse, who was in the vicinity, what happened to Lafferty and the windows on Lafferty's truck. White Horse replied, "Yeah, yeah, we, we did that. He was trying to assault us with his pickup there."[1] Marrufo again asked "what happened," after which he inquired whether Lafferty was trying to drive off. White Horse answered affirmatively to the latter inquiry and then relayed what he saw and heard, pointing at times to certain places.[2] Upon identifying White Horse, Marrufo quizzed him about how Lafferty's vehicle was parked, which way it was facing, and its path of travel. White Horse provided the requested information – orally and with directional gestures.[3] Marrufo continued to take snapshots and investigate and eventually left the scene.

Two to three hours later, Marrufo and CRST Officer Ronald Red Owl went back to the scene and knocked on the front door to the house White Horse earlier stated he lived in.[4] It was cold that night and the ground had a blanket of snow and frost on it.[5] An unidentified man opened the door. When Marrufo asked for Jerome, the man

---

[1] Mot. Hrg. Ex. 3, 07:06-07:10 (Feb. 5, 2021).

[2] *See id*. at 07:12-07:34.

[3] *See id.* at 07:35-08:19.

[4] *See* Mot. Hrg. Tr. 17-18 (Feb. 5, 2021); Mot. Hrg. Ex. 1 at 00:01-00:21; Mot. Hrg. Ex. 3 at 07:02-07:03.

[5] *See* Mot. Hrg. Ex. 3; Mot. Hrg. Ex. 1 at 00:01-00:20.

turned and motioned toward someone on the couch, and walked away.[6] White Horse promptly greeted the officers as they entered and stood in the living room, a few feet away from the door.[7] There, the officers questioned White Horse about the assault for roughly four minutes, beginning with what happened.[8] Donna Straight Head, the owner of the house, joined White Horse and answered some of the officers' questions.[9] The officers did not *Mirandize* White Horse before interrogating him, even though he was a focus of their investigation.[10] At the end of the interview, Marrufo thanked White Horse and shook hands with both White Horse and Straight Head before leaving.[11] White Horse was never handcuffed or confined while questioned or arrested when the dialogue ended.[12]

Lieutenant Marrufo captured his interactions with White Horse on body camera recordings he made at the scene and in the doorway of Straight Head's house.[13] They provide video and audio accounts of Marrufo and White Horse's conversations.

---

[6] *See* Mot. Hrg. Ex. 1 at 00:22-00:30.

[7] *See id*. at 00:30-00:34.

[8] *See id*. at 00:36-04:40.

[9] *See id*. at 01:46-04:41.

[10] *See* Mot. Hrg. Tr. 11, 14-15, 18, 22.

[11] *See* Mot. Hrg. Ex. 1 at 04:38-40, 04:42-04:43.

[12] *See* Mot. Hrg. Ex. 1.

[13] *See* Mot. Hrg. Exs. 1, 3.

3

Tragically, Lafferty did not survive his injuries. A grand jury later indicted White Horse for second degree murder (of Lafferty), assault with a dangerous weapon (a garden hoe), and assault resulting in serious bodily injury. White Horse moved to suppress his statements on *Miranda* and Fourth Amendment grounds. The Court held an evidentiary hearing on the motion at which it heard testimony from Lieutenant Marrufo and received four exhibits into evidence (the two recordings just mentioned and transcripts of them).

## DISCUSSION

**A. Statements**

At the outset, White Horse claims his statements, at the scene and inside the residence, were obtained in violation of *Miranda*. He was subjected to custodial interrogation, he says, with no *Miranda* advisement. It appears undisputed that the officers' questioning of him, in both places, amounted to "interrogation," for purposes of *Miranda*.[14] The issue then is whether White Horse was in custody when he made his statements to the officers at each location. If so, they must be suppressed because the officers gave no *Miranda* warnings before questioning him. If not, the statements are admissible as substantive evidence.

---

[14]*See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect).

Officers need not administer *Miranda* warnings to everyone they question.[15] Instead, "warnings are required only where there has been a restriction on a person's freedom as to render him 'in custody.'"[16]

"Custody" is a "term of art" that describes circumstances generally thought "to present a serious danger of coercion."[17] The central issue in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[18] "Two distinct inquiries are essential to this determination: First, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonably person have felt he [ ] was not at liberty to terminate the interrogation and leave."[19] "[T]he critical [question] is not whether the interview took place in a coercive or police dominated environment, but rather, whether the [suspect's] 'freedom to depart was restricted in any way.'"[20] When gauging the suspect's freedom of movement, a court must examine "all of the

---

[15] *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

[16] *Id*.

[17] *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

[18] *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (internal quotation omitted).

[19] *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (*quoting Thompson* and emphasizing that the custody determination has "two discrete inquiries").

[20] *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (*en banc*) (*quoting Mathiason*, 429 U.S. at 495).

circumstances surrounding the interrogation."[21]  Pertinent facts include, but are not limited to, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the [suspect] at the end of the questioning."[22]  In its review, a court must keep in mind that "the [custody] determination is based on the objective circumstances of the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned."[23]

**1. At the Scene**

*Miranda* specifically exempted from its purview "[g]eneral on-the-scene questioning as to facts surrounding a crime or general questioning of citizens in the fact finding process[,]" which do not present "the compelling atmosphere inherent in the process of in-custody interrogation[.]"[24]  Lieutenant Marrufo's questions were appropriate and typical, given the circumstances involved.  Consistent with his duties as a police officer, Marrufo, as a first responder, attempted to determine what happened

---

[21]*Howes*, 565 U.S. at 509 (*quoting Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (*per curiam*)).

[22]*Howes*, 565 U.S. at 509 (citations omitted); *see also United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir. 2004) (explaining that there is no requirement that the six "non-exhaustive" *Griffin* factors be followed ritualistically and that courts should consider "whether the *historical facts*, as opposed to the one-step-removed *Griffin* factors, establish custody").

[23]*LeBrun*, 363 F.3d at 720 (*quoting Stansbury*, 511 U.S. at 322-23).

[24]384 U.S. at 477-78.

and how the players and evidence all fit together. His questions were open-ended, non-accusatory, and investigative. Questions such as "what happened," do not implicate *Miranda* and require warnings in advance.[25]

## 2. In the Home

The same is true of Lieutenant Marrufo and Officer Red Owl's follow-up questions in Straight Head's living room. The Eighth Circuit has repeatedly observed that questioning a suspect "on his own turf" is "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."[26] *Miranda* itself, juxtaposed the police station, where "the investigator possesses all of the advantages," with the suspect's "own home" where "he may be confident, indignant, or recalcitrant . . . more keenly aware of his rights and more reluctant to tell of his indiscretions and criminal behavior. . . ."[27]

---

[25] *See United States v. Looking Elk*, CR. 10-50090-JLV, 2011 WL 835888 at *9 (D.S.D. March 4, 2011) ("general on-the-scene questioning includes questions such as "what happened," "who was in the vehicle," and "who was driving," when a vehicular accident has occurred); *United States v. Porras-Palma*, CR. 10-50044-JLV, 2010 WL 2484090 at *6 (D.S.D. May 24, 2010), *R&R adopted*, 2010 WL 2464864 (D.S.D. June 15, 2010) (modest number of questions asked of defendant that elicited an incriminating statement about his legal status in the United States were part of a vehicle accident reconstruction and did not violate *Miranda*.)

[26] *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014); *see generally* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, §6.6(e), pp. 822-23 & nn. 67-70 (4th ed. 2015 & Dec. 2020 update).

[27] 384 U.S. at 449-50 (internal quotations omitted).

In the Supreme Court's only decision involving the applicability of *Miranda* to questioning of a suspect in a private home absent formal arrest, the Court concluded that the suspect "hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding."[28] The Court explained that "the principal psychological factor" of concern in *Miranda* was "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate [him] to the will of his examiner.'"[29] The teaching in that case, which involved a three-hour interrogation in the dining room of a residence, was that such noncustodial interrogation could lead (in some situations) to the exclusion of involuntary statements under the Fifth Amendment, but that the interview was not so inherently coercive to require compliance with *Miranda's* prophylactic rule.[30]

Lieutenant Marrufo and Officer Red Owl interviewed White Horse in a familiar and relaxed setting. The officers asked a modest number of questions, for about four minutes, and then left the residence. Straight Head participated in the interview and periodically interjected answers to questions. At no time was White Horse ever isolated from Straight Head or restrained in any way. To the contrary, he was free to move about the living room, and did so, during the interview.

---

[28]*Beckwith v. United States*, 425 U.S. 341, 347 (1976).

[29]*Id*. at 346 & n.7 (*quoting Miranda*, 384 U.S. at 457).

[30]*Id*. at 347-48.

White Horse voluntarily acquiesced to questions posed to him, candidly acknowledging he hit Lafferty (showing his right fist), and insisting he was the only one who assaulted Lafferty (pointing to himself).[31] The atmosphere of the encounter was not police dominated. Neither officer employed any strong-arm tactics or deceptive stratagems to goad White Horse into making inculpatory admissions. Nor did the officers ever display weapons or have physical contact with White Horse. And at no time did the officers say or intimate to White Horse that there would be criminal repercussions for his conduct. Importantly, the officers never made any show of force or took action comparable to, much less the functional equivalent of, an arrest. In the end, White Horse was not arrested after confessing and could do whatever he desired when the agents left.[32]

White Horse's personal characteristics – including whatever his intellectual functioning may have been at the time – did not transform the interrogation into a

---

[31] *See* Mot. Hrg. Ex. 1, 01:32-01:41, 03:09-03:12, 03:44-03:52.

[32] *See United States v. Galceran*, 301 F.3d 927, 931 (8th Cir. 2002) (observing that the lack of an arrest is "a very important factor weighing against custody"); *see also Mathiason*, 429 U.S. at 495 (stressing that after questioning, defendant left "the police station without hindrance").

9

custodial one.[33]  He was 60 years old when he met with the officers[34] and, based on the recording,[35] did not appear to have any difficulty responding to questions or exhibit any unusual intellectual deficit or mental impairment.[36]

It is true that Lieutenant Marrufo and Officer Red Owl did not tell White Horse that (1) the questioning was voluntary; (2) he was free to leave or request the officers to

---

[33]*See J.D.B.*, 564 U.S. at 270-71 (whether a suspect is in "custody" is an objective inquiry that "involves no consideration of the 'actual mindset' of the particular suspect subject to police questioning"; such an inquiry "avoids burdening police with the task of anticipating the idiosyncricies of every individual suspect and defining how the particular traits affect each suspect's subjective state of mind"); *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004) (officers are under no duty "to consider . . . contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights"); *Berkemer v. McCarty*, 468 U.S. 420, 423, 439 (1984) (although the suspect's inebriation was readily apparent to officers at the scene, the Supreme Court's analysis did not advert to this or any other individualized consideration in concluding that the traffic stop did not qualify as the equivalent of a "formal arrest"); *Beheler*, 463 U.S. at 1124-25 (it was "irrelevant" that police knew defendant "had been drinking earlier in the day" and was "emotionally distraught"; he was not in custody under the objective reasonable-person standard); *Perrin*, 659 F.3d at 721 (defendant's sub-average intelligence and mental deficits did not establish custody); *United States v. Little*, 18 F.3d 1499, 1505 (8th Cir. 1994) (particular personal traits of defendant are irrelevant to the objective "reasonable person" test for police-citizen encounter other than to the extent they may have been known to the officer and influenced the officer's conduct).

[34]*See* Dkt. No. 15.

[35]*See* Mot. Hrg. Ex. 1.

[36]*See Perrin*, 659 F.3d at 721; *see also* Dkt No. 15 (White Horse had 11 1/2 years of formal education and could read, write, and understand the English language); *Galceran*, 301 F.3d at 931 (defendant's claims that he was mentally ill, suicidal, and had been hearing voices did not make his interrogating custodial).

do so; and (3) he was not under arrest.[37] But the failure to provide such warnings does not mean that a suspect is in custody, especially if the totality of the circumstances show otherwise.[38]

Taking into account and weighing the circumstances surrounding the statements in the home, a reasonable person in White Horse's position would not have understood he was in custody while speaking to Lieutenant Marrufo and Officer Red Owl. The officers thus did not have to warn White Horse of his *Miranda* rights before interviewing him.[39]

## B. Entry into the Home

### 1. Standing

A defendant must have "standing" to invoke the Exclusionary Rule.[40] To obtain relief under the Rule, the defendant must show that he had a legitimate expectation of privacy in the invaded place.[41]

---

[37] *See Griffin*, 922 F.2d at 1349.

[38] *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007) (suspect was not in custody despite not being informed he was free to leave); *United States v. Mottl*, 946 F.2d 1366, 1370-71 (8th Cir. 1991) (even though officers failed to tell the suspect that he could terminate the interview at will and that they did not intend to arrest him, the totality of the circumstances established that he was not in custody); *see also LeBrun*, 363 F.3d 719-24 (resolving the custody issue with nary a mention of *Griffin* or the factors discussed in it).

[39] *See United States v. Giboney*, 863 F.3d 1022, 1027-29 (8th Cir. 2017); *Williams*, 760 F.3d at 814-15; *Perrin*, 659 F.3d at 720-22; *Czichray*, 378 F.3d at 826-30.

[40] *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).

White Horse had a lawful right to be in the residence on February 12-13. As an overnight guest and occupant at the time, he has standing to contest the warrantless entry into the house.[42] The Government concedes that standing exists and that White Horse can challenge the propriety of the officers' home entry.[43]

**2. Consent**

White Horse also claims the warrantless entry into Straight Head's residence violated the Fourth Amendment. As he sees it, Lieutenant Marrufo and Officer Red Owl were required, but failed to obtain, a warrant before entering the house and interviewing him.

The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures."[44] "In the absence of a warrant, a search is unreasonable only if it falls within a specific exception to the warrant

---

[41] *See Minnesota v. Olson*, 495 U.S. 91, 95 (1990).

[42] *See Minnesota v. Olson*, 495 U.S. 91, 96-100 (1990); *see also United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995) (testimony that the defendant "had been staying in the apartment and questioned 'for a couple of days' as a guest, alone sufficient to establish standing); *State v. Tullous*, 2005 S.D. 5, ¶16, 692 N.W.2d 790, 794 (the defendant had standing, as he "regularly stayed overnight" and at times baby-sat for a child in the house); *see generally* 6 Wayne R. LaFave, *Search and Seizure*, §11.3(b) at pp. 190-94 & nn. 102-08 (6th ed. 2020).

[43] *See* Mot. Hrg. Tr. 4-5.

[44] U.S. Const. amend. IV.

requirement."[45] One recognized exception is the voluntary consent of an individual possessing authority over the premises.[46] That person might be a homeowner,[47] or a fellow occupant who shares common authority over the property with another person.[48] The exception even extends to entries with the permission of a person the police reasonably, but erroneously, believe to possess shared authority as an occupant.[49]

While one person's consent of a jointly occupied home is generally sufficient to justify a warrantless entry, there is a narrow exception to this rule. A "physically present inhabitant's express refusal of consent to a police entry into the residence is dispositive as to him, regardless of the consent of a fellow occupant.[50] The rule, however, is limited to situations in which the objecting occupant is present.[51] Thus, for consent to be vitiated, the complaining occupant must be personally present unless

---

[45]*Riley v. California*, 573 U.S. 373, 382 (2014).

[46]*See Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990).

[47]*See Fernandez v. California*, 571 U.S. 292, 298-99 (2014); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

[48]*See United States v. Matlock*, 415 U.S. 164, 170 (1974).

[49]*See Rodriguez*, 497 U.S. at 186.

[50]*See Randolph*, 547 U.S. at 122-23.

[51]*See Fernandez*, 571 U.S. at 301.

13

"there is evidence that the police have removed [him or her] from the entrance for the sake of avoiding possible objection."[52]

Consent may be express or implied.[53] Implied consent is established when an occupant willingly allows, by words and action and without objection, officers to enter the residence.[54] "There is no requirement that consent be in response to an officer's request."[55] "In fact, consent given without a specific request indicates voluntariness."[56]

The precise question is not whether any of the home occupants consented subjectively, but whether their conduct would have caused a reasonable person to believe they collectively consented to the entry of the residence.[57] Having reviewed Lieutenant Marrufo's body-camera recording,[58] the Court concludes that the occupants' actions would have engendered just such a belief.

---

[52]*Id*. at 302 (*quoting Randolph*, 547 U.S. at 121).

[53]*See United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008); *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006); *see also United States v. Turbyfill*, 525 F.2d 57, 59 (8th Cir. 1975) (an invitation or consent to enter a house may be implied as well as expressed).

[54]*See United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016); *United States v. Faler*, 832 F.3d 849, 853 (8th Cir. 2016).

[55]*Williams*, 521 F.3d at 907 (*citing Florida v. Royer*, 460 U.S. 491, 497 (1983)).

[56]*Williams*, 521 F.3d at 907.

[57]*See id.*; *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001).

[58]*See* Mot. Hrg. Ex. 1.

The recording shows that Lieutenant Marrufo and Officer Red Owl's belief – that they had consent from one or more occupants to enter – was objectively reasonable. Although none of the occupants affirmatively expressed consent to the officers' entry – either verbally or nonverbally – the occupants also did not try to close the front door, protest when the officers walked into the house, or asked them to leave. The unidentified occupant, who opened the front door, stepped back and pointed White Horse out when Marrufo asked for White Horse. An objectively reasonable officer could interpret that series of actions as an invitation to enter.[59] Nothing any of the occupants said or did, after the front door opened, gave the officers reason to believe they could not walk in and talk to White Horse or anyone else inside the residence. Because the home entry was consensual, the officers had a legitimate basis for being in the living room when they spoke with White Horse and Straight Head.

### C. Fruit of the Poisonous Tree

White Horse lastly claims the statements he made to Lieutenant Marrufo and Officer Red Owl were the product of the officers' illegal entry into the home and must

---

[59]*See Rodriguez*, 834 F.3d at 941; *Faler*, 832 F.3d at 853; *see also United States v. Greer*, 607 F.3d 559, 563-64 (8th Cir. 2010) (when defendant "opened the door to the porch and stepped back, he impliedly invited the officers to enter"); *United States v. Smith*, 973 F.2d 1374, 1376 (8th Cir. 1992) (implying consent when the defendant's wife stepped aside and motioned for officers to enter); *Turbyfill*, 525 F.3d at 58-59 (the occupant's action in opening the door and stepping back constituted an implied invitation to enter).

be suppressed under the Exclusionary Rule.[60] But because there was no Fourth Amendment or "poisonous tree" for any "tainted fruit" to grow or fall from, White Horse's statements are fully admissible against him as substantive evidence at trial.[61]

## CONCLUSION

White Horse's statements to Lieutenant Marrufo and Officer Red Owl, at the scene and in Straight Head's home, were not in response to custodial interrogation. And the officers' entry into the residence, and questioning of him in the living room of it, was consensual. No basis, therefore, exists to exclude the statements under *Miranda*, the Fourth Amendment, or as "tainted fruit." Stymied by the facts and the law, White Horse cannot prevail on his suppression motion.

## RECOMMENDATION

Based on the authorities and legal analysis discussed in this report and the record now before the Court, it is hereby

---

[60] *See Wong-Sun v. United States*, 371 U.S. 471, 487 (1963).

[61] *See United States v. Crisolis-Gonzalez*, 742 F.3d 830, 838 (8th Cir. 2014); *United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013); *see also United States v. Bravebird*, 3:16-CR-30061(01)-RAL, 2016 WL 6603170 at *6 (D.S.D. Nov. 8, 2016) (inasmuch as occupant had the apparent authority to consent to a search of the residence, the statements defendant made to a tribal agent later on were not subject to exclusion under the fruit of the poisonous tree doctrine); *United States v. Zastrow*, 4:16-CR-40004-KES, 2016 WL 11407824 at **3, 6 (D.S.D. June 9, 2016), *R&R adopted*, 2016 WL 3546240 (D.S.D. June 24, 2016) (because the police did not violate defendant's Fourth Amendment rights in the consensual search that resulted in discovery of the shotgun, his subsequent statements need not be suppressed as the fruit of a poisonous tree).

RECOMMENDED that White Horse's Motion to Suppress Statements[62] be denied in its entirety.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to file their objections to the same.[63] Unless an extension of time for cause is later obtained,[64] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[65] Objections must "identify[] those issues on which further review is desired[.]"[66]

Dated this 11th day of February, 2021, at Pierre, South Dakota.

                                           **BY THE COURT:**

                                           **MARK A. MORENO**
                                           **UNITED STATES MAGISTRATE JUDGE**

---

[62] *See* Dkt. No. 105.

[63] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[64] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[65] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[66] *Arn*, 474 U.S. at 155.